In the Matter of NAFTALIN & CO., INC., a Minnesota Corporation, Alleged Bankrupt, Appellee-Cross Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware Corporation, et al., Petitioners-Appellants-Cross Appellees.

Nos. 71–1634, 71–1672.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1972.

Decided Nov. 29, 1972.

Burton R. Rissman, Chicago, Ill., for Kipnis, Donaldson and DuPont.

L. H. May, Jr., Minneapolis, Minn., for Merrill Lynch.

Joe A. Walters, Minneapolis, Minn., for Naftalin.

Before VAN OOSTERHOUT and MURRAH,* Senior Circuit Judges, and HEANEY, Circuit Judge.

MURRAH, Senior Circuit Judge.

The primary controversy in this bankruptcy proceeding involves the proper interpretation and application of various sections of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and its implementing regulations. The appellants, six firms engaged in business as securities brokers and dealers, filed involuntary bankruptcy petitions against Naftalin & Company, Inc., also a registered securities broker and dealer, alleging claims totaling more than $650,000 which Naftalin is financially unable to satisfy. The alleged claims are based on Naftalin's asserted breach of certain stock sales contracts which it had entered into with the petitioning creditors. Naftalin's defense is that the contracts are void and unenforceable because entered into in violation of section 7 of the Securities Exchange Act and Regulation T, thereunder; or, in the alternative, that even if initially valid they became unenforceable for failure of the creditors to timely liquidate the contracts as required by the Act and regulations; and, in any event, that the damages claimed should be limited to what they would have amounted to had such liquidation been properly carried out. Sec-

* Senior Circuit Judge, Tenth Circuit, sitting by designation.

tion 7, 15 U.S.C. § 78g,[1] prohibits securities brokers and dealers from extending credit to any customer in contravention of rules and regulations prescribed by the Board of Governors of the Federal Reserve System. Regulation T, promulgated by the Board of Governors pursuant to section 7, provides in presently material part:

"(c) *Special Cash Account.*

"(1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may:

"(i) Purchase any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment.

"(ii) Sell any security for, or purchase any security from, any customer, provided the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be *promptly deposited* in the account." 12 C.F.R. § 220.4. (Emphasis supplied.)

The District Court referred the proceedings to the Referee in Bankruptcy.

315 F.Supp. 463. After consolidating the proceedings and conducting lengthy hearings, the Referee determined that the petitioning creditors had not violated any provisions of the Act or Regulation T, that their contracts with Naftalin were legal, enforceable, and constituted valid claims, and adjudged Naftalin bankrupt. On review the District Court held that the petitioning creditors had violated Regulation T and re-referred the case to the Referee for a determination of what the creditors' claims would amount to if the contracts with Naftalin had been liquidated in compliance with the court's construction of the Regulation. 333 F.Supp. 136. The appealability of the District Court's order is uncontested. Although we are in essential agreement with the District Court's decision, we think it must be modified in some respects, and we remand the case for that purpose.

### The Operative Facts

Naftalin & Co., Inc., was incorporated in 1960 by Neil T. Naftalin, its president and 80% stockholder, and two of his associates. It registered as a securities dealer under applicable federal and Minnesota securities laws, and also became a member of the National Association of Securities Dealers (NASD).[2] From 1960 through 1962 Naftalin conducted a general retail securities business with the public. Beginning in 1963, however, it restricted its business primarily to the purchase and sale of securities for its own account and the personal accounts of Neil Naftalin and a few of his close friends and associates. Since the time it ceased doing business

---

1. 15 U.S.C. § 78g, as pertinent to this case, provides:

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

"(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal

Reserve System shall prescribe under subsections (a) and (b) of this section. . . ."

2. Naftalin has maintained its SEC registration and NASD membership since 1960, with the exception of a 20-day period in 1964, when it was suspended by the NASD for violations of Regulation T unrelated to this action. Its Minnesota registration was revoked in December 1969, when it entered into a stipulation with the Minnesota Securities Commission that it was insolvent.

with the public, Naftalin & Co. has operated as a one-man business with Neil Naftalin conducting all of its affairs.

In 1966, Naftalin began a series of "short-selling cycles"—colloquially known as "free-riding." Relying on his astuteness and sophistication in market analysis, Neil Naftalin would watch selected stocks until, in his judgment, they had peaked. He would then place orders with several securities dealers in Minneapolis and other areas of the country to sell large amounts of these stocks for the account of Naftalin & Co., although Naftalin did not own any of the stock. He specifically placed the sell orders in "cash accounts," knowing that such accounts could properly be utilized only when the seller owned the securities it was selling. Naftalin would then watch for the anticipated decline in the market for the securities sold. When he concluded that it had reached its low point, or that he had misjudged the market, he would make offsetting purchases of the securities through different brokers, obtain delivery from them, and then redeliver the securities to the broker through whom they had previously been sold. Receiving payment against delivery, Naftalin would, of course, realize a profit or loss on the difference between sale and purchase prices. This scheme was generally successful and Naftalin gradually increased the scope of its activity. In various cycles Naftalin realized profits and losses in excess of $800,000. Naftalin was at pains to conceal the fact that he was selling short, and when occasionally pressed as to why delivery of securities was slow he would mislead the questioning broker/dealers with prevarications and evasions.

In August, 1969, Naftalin embarked upon its most extensive short-selling venture—the one that resulted in this litigation. During that month Naftalin placed sell orders in excess of $10,000,000 with 27 separate securities dealers, six of whom are the petitioning creditors. As in earlier cycles, Naftalin made certain that each sale was placed in a special cash account and concealed the fact that the transactions were actually short sales. Most of these sales were brokerage or agency transactions in which the broker/dealer charged a commission for acting as Naftalin's agent in the sale of the stock to a third party. Appellant Kipnis & Company emphasizes the fact that, in addition to acting as agent on some sales, it purchased stock from Naftalin as principal for its own account in third market transactions. When Naftalin did not deliver the securities sold by settlement date the broker/dealers usually made delivery to purchasing brokers from stock in their own inventory or borrowed by them.

During this cycle the market prices of the securities which Naftalin had sold began to rise almost immediately after the sales and continued to climb for several weeks, making it financially impossible for Naftalin to effectuate offsetting purchases as he had planned. After several weeks, some of the broker/dealers began to inquire of Naftalin as to when they could expect delivery. Naftalin met these inquires with typically evasive and misleading replies.[3] Kipnis, along with some of the non-petitioning broker/dealers, demanded and received mark-to-the-market payments[4] from Naftalin. After finally concluding

---

3. He would state, for example, that the stock was in the process of being split, that it carried due bills, that it was being held up by the transfer agent, or that it had been purchased on the third market, and that these factors were the cause of the slow deliveries.

4. When a transaction remains open and there is a market swing away from the price at which the transaction was nego-tiated, the adversely affected party will often call upon the other party to make a cash deposit to cover the market swing. After being expressly assured by Neil Naftalin on September 4, 1969, that the securities in question were not sold short, Kipnis asked for a deposit of $93,000 which Neil paid out of his own resources. This payment operates to reduce the loss which Kipnis ultimately sustained.

that his predicament was financilly hopeless, Naftalin called a meeting of the 22 broker/dealers affected by the still outstanding short sales. At this meeting the broker/dealers were informed for the first time that Naftalin did not own the securities it had sold and could not meet its delivery obligations. The broker/dealers then bought-in the undelivered stocks for Naftalin's account at an aggregate loss of more than $1,285,000.

Shortly thereafter, in response to proceedings initiated by the Securities and Exchange Commission (SEC), the District Court (Larson, J.) appointed a receiver for Naftalin. The appellants then filed two involuntary bankruptcy petitions under section 59(b) of the Bankruptcy Act, 11 U.S.C. § 95(b), alleging that Naftalin had committed the "fifth act of bankruptcy," 11 U.S.C. § 21(a)(5), by permitting a receiver to be appointed at a time when it was insolvent and unable to pay its debts as they matured. The petitioning creditors' aggregate asserted claims of $653,734.54 are based primarily on the differences between the buy-in price and the original sales price of the undelivered stock.

## The Issues

Despite its obvious and calculated wrongdoing, Naftalin contends that it was the petitioning creditors' failure to comply with section 7 of the Securities Exchange Act and its implementing regulations which made the short-selling scheme possible, and, therefore, that as a matter of sound public policy the petitioning creditors should not be permitted to enforce their contracts. Naftalin's contention is that the petitioning creditors violated section 7 of the Act and section 4(c)(1)(ii) of Regulation T, *supra*, by accepting Naftalin's sell orders for its special cash account when the securities sold were not then held in the account and, that in light of Naftalin's past performances, the dealers could not "in good faith" have believed that the securities would be "promptly" deposited in the account. Naftalin also argues that the petitioning creditors violated SEC Rule 10a, 17 C.F.R. § 240.-10a–1 and 10a–2, the "short-sale rule." [5] These violations are said to make invalid and unenforceable the dealers' contracts with Naftalin since section 29(b) of the Act, 15 U.S.C. § 78cc(b),[6] provides that any contracts made in violation of the

---

5. As applicable herein, Rule 10a provides:
   "17 C.F.R. § 240.10a–1
   \*　　\*　　\*　　\*　　\*
   "(b) no member of a national securities exchange shall, by the use of any facility of such exchange, execute any sell order unless such order is marked either 'long' or 'short.'
   "(c) No member of a national securities exchange shall mark a sell order 'long' unless (1) the security to be delivered after sale is carried in the account for which the sale is to be effected, or (2) such member is informed that the seller owns the security ordered to be sold and as soon as is possible without undue inconvenience or expense, will deliver the security owned to the account for which the sale is to be effected.
   \*　　\*　　\*　　\*　　\*
   "17 C.F.R. § 240.10a–2
   "(a) No member of a national securities exchange shall lend, or arrange for the loan of any security for delivery to the broker for the purchaser after sale, or shall fail to deliver a

security on the date delivery is due, if such member knows or has reasonable grounds to believe that the sale was effected, or will be effected, pursuant to an order marked 'long' unless such member knows, or has been informed by the seller, (1) that the security sold has been forwarded to the account for which the sale was effected; or (2) that the seller owns the security sold, that it is then impracticable to deliver to such account the security owned and that he will deliver such security to such account as soon as is possible without undue inconvenience or expense."

6. As applicable herein, 15 U.S.C. § 78cc provides:
   "(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any

Act or any rule or regulation thereunder, "shall be void as regards the rights of any person who, in violation of such provision, rule or regulation, shall have made or engaged in the performance of any such contract." Finally, Naftalin contends that even if the contracts were not void and unenforceable at their inception the petitioning creditors, nevertheless, violated section 7 of the Act and section 4(c)(1)(ii) of Regulation T by failing to liquidate the transactions with buy-ins when it first became apparent that the securities would not be "promptly" delivered, and that as a consequence of such violations either the contracts are entirely void under section 29(b) of the Act, or the petitioning creditors' claims should be limited to what they would have amounted to if the buy-ins had been effectuated on or near settlement date rather than the dates when they were finally made.

As we have seen, the Referee rejected Naftalin's defenses and concluded that the sales contracts were valid and enforceable. The District Court—apparently concurring in the Referee's determination that the dealers had not violated Rule 10a, and expressly finding that the dealers had initially complied with section 4(c)(1)(ii) of Regulation T by accepting Naftalin's sell orders with the requisite good faith belief that the se-

curities would be promptly deposited— agreed with the Referee's conclusion that as originally made the sales contracts were valid and not in violation of any rules or regulations. The court went on, however, to find that the term "promptly deposited" was to be interpreted in light of the seven business-day period provided in section 4(c)(2) of Regulation T,[7] and the securities industry's seven calendar-day settlement date specifically set forth in all of the sales contracts.[8] The court noted that after the settlement date had passed without delivery of the securities, "the claim of good faith by the brokers is extremely thin," and that at this point the dealer should be on notice that he may be acquiescing in the illegal extension of credit to his customer and, thus, under duty to take affirmative action either to obtain the securities from the customer or to liquidate the transaction. On this premise and because none of the petitioning creditors made any inquiry or effort to obtain the securities from Naftalin until well past the settlement date, the court held that they were in violation of Regulation T and hence obligated to buy-in the contracts. The court further ruled that as a result of these violations, the regulatory purposes of the Act and regulations could be achieved only by limiting the broker/dealers' claims against

relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

"(c) Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit . . . made . . . prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension or credit . . . the person making such loan or extension of credit . . . shall have actual knowledge of facts by reason of which the making of such loan or extension of credit . . . is a violation of the provisions of this chapter or any rule or regulation thereunder . . . . ."

7. 12 C.F.R. § 220.4(c)(2):

"In case a customer purchased a security (other than an exempted security) in the special account and does not make full cash payment for the security within seven days after the date on which the security is so purchased, the creditor shall, except as provided in subparagraphs (3) through (7) of this paragraph promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof."

8. The settlement date used throughout the industry is five business days or seven calendar days. Prior to 1946, the industry imposed a two business-day settlement date which has gradually increased in length over the years until reaching its present status in February, 1968.

Naftalin to the losses they would have suffered if they had liquidated the transactions with buy-ins at the opening of the market on the eighth business day following the placing of Naftalin's sell orders. The case was accordingly re-referred to the Referee for a determination of the claims of the petitioning creditors based on this formula.

The petitioning creditors appeal from the District Court's decision insofar as it fails fully to affirm the Referee's order. Naftalin cross-appeals from the District Court's determination that the contracts were initially valid, contending that they were made in violation of Regulation T and Rule 10a, and therefore, unenforceable from their inception.

### Applicability of Regulation T

■■ Regulation T, which is applicable to "every broker or dealer," (see 12 C.F.R. § 220.1) undoubtedly covers the parties and transactions involved in this litigation. The petitioning creditors clearly come within the definition of "creditor" contained in section 2(b) of Regulation T, and Naftalin qualifies as a "customer" under section 2(c).[9] Naftalin's status as a registered securities dealer does not prevent it from also being a customer for purposes of Regulation T. See 12 C.F.R. § 220.101(b), 2 CCH Fed.Sec.L.Rep. ¶ 22,261 (1946); 2 Loss, Securities Regulation 1250, n. 35 (2d ed. 1961).

Section 3(a) of the Regulation, 12 C. F.R. § 220.3(a), requires all financial relations between a creditor and its customer to be handled in a "general account," with the exception of those transactions specifically authorized to be handled in one or more of the "special accounts" provided for in section 4. Special account transactions must be conducted in strict compliance with the terms and conditions set forth in section 4 or a violation of Regulation T occurs. See 12 C.F.R. § 220.4(a)(2). It is conceded that all of the agency transactions between Naftalin and the petitioning creditors were handled in "special cash accounts," provided for in section 4(c). Kipnis argues, however, that the third market transactions in which it acted as principal were handled in a "special miscellaneous account," provided for in section 4(f), (in which a broker/dealer acting only as a principal may execute a buy or sell transaction with a customer who is also a registered broker/dealer) rather than a special cash account (in which a broker/dealer acting either as principal or agent may execute both buy and sell orders for any customer). The District Court, apparently finding the Referee's acceptance of this argument to be erroneous, held that principal and agency transactions alike were carried by the various broker/dealers as special cash accounts.

■ We agree with the District Court for these reasons. Section 4(a)(2) states that, "Each . . . special account shall be recorded separately and shall be confined to the transactions and relations specifically authorized for such account . . . ." 12 C.F.R. § 220.4(a)(2). Kipnis maintained only one account for Naftalin and executed both principal and agency transactions in that account. The transactions were treated identically for all practical purposes, and the evidence tended to show that prior to trial Kipnis was, at least, uncertain as to what type of transactions were allowed under the various special accounts. Although Naftalin's sole account with Kipnis was untitled, it must be treated as a special cash account since it was used for both agency and principal transactions.

9. 12 C.F.R. § 220.2(b) and (c) state: "(b) The term 'creditor' means any broker or dealer including every member of a national securities exchange. "(c) The term 'customer' (1) includes any person, or any group of persons acting jointly, (i) to or for whom a creditor is extending, arranging, or maintaining any credit, or (ii) who, in accordance with the ordinary usage of the trade, would be considered a customer of the creditor . . . ."

### Initial Validity of the Sales Contracts

■ Purchases and sales in special cash accounts must be "bona fide cash transactions," and must be carried out in accordance with a good faith agreement between the broker/dealer and his customer concerning prompt payment or delivery. Naftalin contends on cross-appeal that at the time it placed the sell orders it was not asked and did not inform the petitioning creditors that it either owned or would promptly deliver the securities sold as required by section 4(c)(1)(ii); and, furthermore, that such information and agreements could not be inferred by the petitioning creditors because of Naftalin's history of slow deliveries in previous transactions with them.[10] These deficiencies are said to prevent the sales from being bona fide cash transactions and to make the contracts illegal and unenforceable from their inception. If this is true the petitioning creditors can have no valid claim, hence no standing as creditors, and our lawsuit comes to an end.

■ The record evidence does substantiate Naftalin's assertion that few, if any, of the petitioning creditors specifically asked whether it actually owned the stock it was selling at the time the orders were placed. Both the District Court and the Referee, nevertheless, agreed with the petitioning creditors that such information and agreements do not have to be specifically sought and expressed in every transaction, but can, under certain circumstances, be inferred by the broker/dealer. We agree. Sure-

ly the Regulation does not require a broker/dealer specifically to inquire of his customer whether he intends good faith performance. Such a reading of the Regulation would be contrary to the practicalities and essential integrity of the market place.

■■ The District Court went on to determine that the petitioning creditors could very well have acted in good faith in originally believing the securities were owned by Naftalin and would be promptly delivered—previous late deliveries notwithstanding—because of factors such as Naftalin's reputation as a registered dealer and member of NASD, and its sophistication in the workings of the market which lent credibility to the false and evasive information it gave. We agree with the general premise that a cash transaction cannot be "bona fide" in the face of consistent failures by the customer to settle previous cash transactions promptly;[11] however, under the particular circumstances of this case, we also agree that the petitioning creditors could have reasonably inferred Naftalin's good faith agreement to make prompt delivery. In any event, the Referee's and District Court's conclusions to that effect are not clearly erroneous.

■ Nor do we think that any violations of SEC Rule 10a, 17 C.F.R. § 240.10a–1 and 10a–2, resulted from the petitioning creditors' failure to expressly request or receive specific information at the time the sell orders were placed.[12] This brings us to agree with

---

10. The record indicates, for example, that during the first seven months of 1969, Naftalin deposited securities with the petitioning creditors in connection with approximately 90 different sales transactions. This total includes a single agency transaction with Merrill Lynch and as many as 60 principal and agency transactions with Kipnis. The longest delay in delivery was 109 days after settlement date, and, on the average, delivery was made approximately 40 days after the settlement date.

11. *See* 26 Fed.Res.Bull. 1172, 1173 (1940); 2 Loss, Securities Regulation, *supra* at 1254.

12. All the petitioning creditors except Kipnis marked their sell orders "long" in compliance with the requirements of Rule 10a–1(b) *(see* note 5, *supra).* The rule is not applicable to Kipnis which is not a member of a national exchange on which the sales were effected. The information which must be received before a sell order can properly be marked "long" *(see* § 240.10a–1(c)) or securities loaned for delivery purposes *(see* § 240.10a–2 (a)) could have been inferred by the petitioning creditors for purposes of Rule 10a just as it could for the purposes of Regulation T, and for substantially the same reasons.

the District Court and Referee that as originally entered into the sales contracts between Naftalin and the petitioning creditors were valid and enforceable.

### Continuing Obligations of the Broker/Dealers

■ The mere making of a sales contract, valid and enforceable at its inception, does not, without more, spell complete compliance with the provisions of Regulation T. Prior to 1939, section 4(c) contained a provision expressly requiring brokers and dealers to liquidate sales transactions as well as purchase transactions if delivery or payment had not been made within seven days of the date on which the sale or purchase was made. The petitioning creditors, however, call attention to the fact that Regulation T was amended in that year for the announced purpose of ". . . clarifying and liberalizing, with appropriate safeguards, provisions that relate to *bona fide* cash transactions in securities . . . ." 25 Fed.Res.Bull. 466 (1939). While the seven-day liquidation requirement for purchase transactions was retained in substantially the same form in section 4(c)(2), the 1939 amendment eliminated the provisions requiring broker/dealers to buy-in if the securities were not delivered within a specific number of days. Thus, in its announcement interpreting the amendment the Federal Reserve Board stated:

> "Cash sales for customers.—When a broker sells a security for a customer in a special cash account, without first having obtained the security from the customer, the broker will no longer be required by the regulation to get the security within a period of 7 days, or within any other specified period. Such a sale cannot be a short sale, since the making of a short sale by a customer in a special cash account is forbidden." 25 Fed.Res.Bull. 466 (1939).

■ The fact that section 4(c)(2) contains a specific liquidation require-

ment for purchase transactions in special cash accounts, whereas there is no equivalent liquidation clause for sales transactions, does not suggest, as the petitioning creditors argue, that the initial good faith acceptance of a sell order is, at once, the beginning and end of the broker/dealer's obligations under the Regulation. Instead, we think the broker/dealer is under a continuing obligation to maintain a good faith assurance that the sale transaction is, in fact, a bona fide cash transaction and that the securities sold will be promptly delivered.

■ The format of the special cash account provisions in section 4(c), indicates that the promulgators of Regulation T were of the opinion that the sale of a security which has not been delivered by the customer is just as much an extension of credit as the purchase of a security for which the customer has not made payment. *See generally* Judson & Emerson, "The Effect of Regulation T on Cash Transactions in Securities," 44 Mich.L.Rev. 997, 1002 (1946). Liquidation of such an illegal extension of credit by buying-in the undelivered stock is an absolute necessity if the integrity of the regulation is to be preserved and its policy effectuated. It is, thus, manifest that the duty to liquidate such a transaction is clearly implied in the absence of a provision specifically directing it.

### Prompt Delivery

In light of this continuing obligation imposed on the broker/dealer by Regulation T, it becomes necessary to determine at what point in time the petitioning creditors could no longer believe in good faith that the securities sold would be promptly delivered. To put it more succinctly, the crux of our lawsuit is the meaning of the term "promptly" in the context of section 4(c)(1)(ii) of Regulation T. Upon facing this question without the aid of any apparent judicial precedent, the District Court interpreted the seven business-day liquidation rule

provided for purchase transactions by section 4(c)(2) as supplying an acceptable equivalent definition for "promptly" as used in section 4(c)(1)(ii) in connection with deliveries on sales transactions.

■ We are persuaded, however, that the 1939 amendment's elimination of the seven-day delivery requirement on the sale side demonstrates an obvious intention to treat sales transactions in special cash accounts differently from purchase transactions. There are, moreover, valid reasons for the different treatment. In purchase transactions the customer's only obligation is to pay for the securities in cash—the availability of which is generally within the customer's realm of control. Whereas, on the other side of the transaction, because of the mechanics of the securities industry over which the customer ordinarily has no control, he may not be able on all occasions to obtain physical possession of securities which he owns and intends to deliver within a specified period of time, such as seven days.[13] We also note that prior to the District Court's decision neither the SEC, the Federal Reserve Board, the self-regulatory agencies (e. g., NYSE and NASD) nor, apparently, any court had interpreted the present version of Regulation T as calling for mandatory liquidation of sales transactions if securities are not delivered within seven days or any other specified period.

These factors of administrative history and interpretation seem inconsistent with the application of any specific time period as an inflexible test of violation of Regulation T. We are convinced that it is inappropriate to consider sales transactions in special cash accounts as being subject to the same specific time limitations applicable to purchase transactions. We are constrained, therefore, to disagree with the District Court's decision insofar as it holds that the seven-day period set forth in section 4(c)(2) provides an "equivalent definition" for "promptly" as used in section 4(c)(1)(ii).

■ The rejection of a specific delivery date requirement does not, however, mean that Regulation T may be read as sanctioning unnecessary or avoidable delays. Section 4(c)(1)(ii) places determinative emphasis upon the broker/dealer's good faith, and in the absence of an absolute liquidation requirement we must focus on that good faith as the test of compliance. The good faith of a broker/dealer who has originally executed a sell order in compliance with Regulation T must gradually dissipate as time passes without delivery of the securities. The time comes when the good faith standard of section 4(c)(1)(ii) requires the broker/dealer to make inquiry concerning the reason for delay and to act accordingly. If, upon inquiry, the broker/dealer ascertains that the slow delivery is unavoidable and out of his customer's control, he may indulge a reasonable delay commensurate with the circumstances without any impairment of good faith. If no credible explanation for the delay is forthcoming, the transaction must be bought-in immediately.[14]

13. It is significant that prior to 1939, section 4(c) authorized committees of national securities exchanges upon application by the broker/dealer to extend the fixed seven-day period in appropriate circumstances. After the amendment such extensions were available only in purchase transactions. See 12 C.F.R. § 220.4(c)(6). Thus, if prompt delivery is equated with an inflexible seven-day period, the result is a far more rigid time limitation for sale transactions than for purchase transactions where extensions are still available. Such a result is directly opposed to realities of the market and the 1939 amendment's announced purpose of "clarifying and liberalizing." See also the extension provided in 12 C.F.R. § 220.4(c)(3).

14. In many situations the customer's excuses for delay would not, without more, entail a credible explanation. As the facts of this case demonstrate so vividly, a customer with some knowledge of the workings of the market can manufacture

The difficult task, of course, is to determine the point in time at which the broker/dealer must take some affirmative action. Because of the flexibility intended for the post-1939 version of Regulation T, we think the fixing of that point must depend in each case upon an analysis of the normal practice and expectations as to delivery existing in the market at the time of the transaction, taking into consideration the actual status and business relationship of the parties involved.

### The Effect of Naftalin's Business Relationship With the Petitioning Creditors

Resolution of the critical question of what would have constituted prompt delivery in this case is largely dependent upon whether Naftalin's business relationship with the petitioning creditors was that of another broker/dealer or an ordinary customer. The petitioning creditors vigorously assert that it is customary to allow broker/dealers more time to make deliveries than is generally accorded other customers, that this practice is recognized and sanctioned in various administrative and industry rules and regulations, and that they were justified in extending such treatment to Naftalin solely because of his status as a registered dealer and member of NASD. They also emphasize that, as a result of the very high volume of trading and other factors occurring in 1968–1969 (the so-called "paper crunch"), delays in the transfer of securities were not at all unusual during the time Naftalin's short-selling activities were in full swing. In support of this argument they point out that at the time these transactions were open, the NASD's Emergency Rules of Fair Practice—an attempt to deal with the exigencies of the paper crunch—permitted broker/dealers as long as 120 days in which to buy-in securities due from other broker/dealers.[15]

The record evidence supports the claim that the usual practice in the industry is to allow broker/dealers more time in delivering securities than is accorded other customers; moreover, there is valid justification for the practice. A broker/dealer usually acts as a middle-man and must await delivery from his customer, another broker/dealer, or a transfer agent before he can satisfy his own delivery obligations. These factors, plus a certain amount of required paper work, result in delays to which the ordinary customer is not subject.[16] Indeed, certain provisions of Regulation T, although not directly applicable to the transactions in this case, implicitly recognize the need for distinguishing between broker/dealers and ordinary customers

endless excuses for late delivery. Undoubtedly, there will be instances where practicality and the broker/dealer's experience will make it necessary to verify customer explanations through independent sources.

15. The Emergency Rules required broker/dealers to begin buy-in procedures if delivery had not been made within 90 days of settlement date. An additional 30 days was allowed for completion of the buy-in procedures. All of Naftalin's transactions with the petitioning creditors were bought-in within the 120-day period.

16. The testimony of an official of Paine Webber was that the reason their office extended this preferential treatment to broker/dealers was:

"Because of the business, type of business. A broker dealer is usually acting on the account of another individual. He has to obtain delivery [from] him and this could be going on backwards and thus, very often, would never be able to deliver on the settlement date as a normal individual should be able to."

An operations manager of Merrill Lynch's Minneapolis office testified:

"Well, a customer, if he's failing to deliver, there's usually just two reasons: number one, he hasn't received it from another broker and we—in that case, we would request a transfer from the other broker; or, number two, he just hasn't sent the stock in, whereas . . . a broker dealer could be— most of the time is dealing with another broker and, you know, he's failing from the other broker. What I'm trying to get across is as a rule the individual customer has his stock in hand."

tomers insofar as delivery requirements are concerned.[17]

Although acknowledging that broker/dealers are generally accorded more time in which to make deliveries, the District Court concluded that Naftalin did not qualify for such treatment under the circumstances of this case. Since the distinction is material to the ultimate factual issue to be decided, it becomes appropriate to discuss the correctness of this ruling.

The factors which normally would call for preferential treatment do not apply to Naftalin because it was simply a one-man operation doing no business with the public, and involved only in the first step of the delivery process. Its position is indistinguishable from that of an ordinary customer insofar as problems relating to the delivery of securities are concerned. *See* 2 Loss, Securities Regulation, *supra* at 1297. The evidence attests, moreover, that the petitioning creditors were aware of Naftalin's actual status and treated it as an ordinary customer except with regard to the delivery of securities.[18] Before a broker/dealer selling securities in a special cash account can properly be granted more time to deliver those securities than would be granted to an ordinary customer, it must be established that the accepted justifications for extending such treatment are, in fact, applicable to it.[19] We agree with the District Court that: "The cloak of a broker-dealer in a one-man operation such as this does not hallow Naftalin so that it is exempt from laws, rules and regulations that apply to others."

Inasmuch as Naftalin must be viewed as a "customer" for purposes of these transactions, the extended buy-in periods set forth in the NASD Emergency Rules and intended only to cover deliveries between broker/dealers, are inapplicable.

There is a large amount of record evidence tending to show that for the ordinary customer delivery is generally ex-

---

17. *See*, for example, section 4(c)(5), 12 C.F.R. § 220.4(c)(5), which provides that in special cash account purchase transactions a broker/dealer may allow his customer as long as 35 days, rather than the usual seven days, in which to pay for securities if they have previously entered into an agreement that payment will not be required until securities are delivered to the customer. As the Federal Reserve Board has stated, the provision merely recognizes, ". . . that the mechanics of the trade, unrelated to the customer's readiness to pay, may sometimes delay such delivery to the customer." *See* 26 Fed.Res.Bull. 1172, 1173 (1940).

    *See also* section 4(f)(3), 12 C.F.R. § 220.4(f)(3), providing that when two broker/dealers are dealing with each other in a special miscellaneous account, delivery against payment is required ". . . as promptly as practicable in accordance with the ordinary usage of the trade."

18. The registered representative of Paine, Webber that dealt with Naftalin testified, "I didn't think he was dealing with the public . . . he was buying for his own account."

Merrill Lynch's representative stated that he knew Naftalin did no business with the public and thought of Naftalin as ". . . a one man show and one man office . . .. I mean that he was a dealer that was in business for himself and had no other employees."

    A vice-president of Piper, Jaffray specifically said that he would classify Naftalin's account as that of a customer, rather than a broker/dealer or institutional account.

    The operations manager of Donaldson made, perhaps, the most cogent statement: "The reason that Naftalin & Company on our books was a client versus a broker-dealer, it was the nature of our business with him. It wasn't in a strict broker-dealer relationship. He was just a client . . .."

19. That Naftalin may have expressly asked one of the petitioning creditors for broker/dealer treatment does not alter the situation, since the petitioning creditors knew, or should have known, that for delivery purposes Naftalin did not qualify for broker/dealer treatment because its status was indistinguishable from that of an ordinary customer.

pected and due on the industry's seven-day settlement date.[20] On the other hand, the evidence showing that the paper crunch had caused some delay in deliveries even in the case of ordinary customers cannot be ignored. While the District Court discussed market practices to some extent, its ultimate decision, as we have seen, was based primarily on the mistaken conclusion that the seven-day liquidation period set forth in section 4(c)(2) provided an acceptable equivalent definition for prompt delivery on the sale side. Because of this, and since the determination of what constitutes prompt delivery in the context of this case involves what is essentially a factual analysis, we think the case must be remanded for determination of that issue in the first instance.[21]

### The Remedy

Without expressing any opinion whether violations of the Regulation have actually occurred, it seems appropriate in the interest of judicial efficiency to discuss the standards to be applied in shaping the remedy in the event any violations are ultimately adjudicated. The petitioning creditors assert that Naftalin is the perpetrator of a calculated and fraudulent scheme, and that to grant it any relief at all is an affront to equity and justice which will encourage more wrongdoing of this type. The law generally looks with disfavor upon the deceiver who opines that his victim should not have been deceived; nevertheless, the unpleasantness of permitting a windfall to the unscrupulous investor may, under certain circumstances, be outweighed by the need for effectuating a broad public policy expressed in regulatory legislation such as the Securities Exchange Act. *See,* Pearlstein v. Scudder & German, 429 F.2d 1136, 1141 (2d Cir. 1970); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 90 (S.D.N.Y. 1968), aff'd, 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969).

■ The legislative history of section 7 of the Act reveals that its primary purpose was to prevent speculation on credit from draining a disproportionate share of the nation's credit resources into the stock market. *See* H.R.Rep.No. 1383, 73d Cong.2d Sess. 8 (1934). It is not directed to the protection of the individual investor to the same extent as other provisions of the Act, but is more concerned with the regulation of macro-economic conditions. Our concern must, therefore, be centered not so much on the culpability of an admitted wrongdoer such as Naftalin but, instead, upon promoting general compliance with section 7's paramount purposes. Consequently, whether Naftalin should be granted some relief if the broker/dealers are found to have violated Regulation T, depends largely on whether such a remedy will further the Act's purposes.

20. For example, several of the confirmation statements used by the petitioning creditors and other broker/dealers with whom Naftalin did business set forth settlement date as the time when delivery was expected and due. Rules and releases of both the NYSE and NASD place emphasis on settlement dates as the deadline for delivery by customers, as opposed to broker/dealers. Inter-office memoranda setting forth compliance procedures of some of the petitioning creditors reveal that they were aware and concerned about receiving delivery from customers on or near settlement date. There was also substantial testimony before the Referee that settlement date was generally recognized as the time when most customers were expected to deliver, although it was not unusual for a few days leeway to be extended.

21. We note with interest that proposed Rule 15c3-3, recently adopted by the SEC, states in subsection (m) that broker/dealers shall be required to buy-in open transactions if they have not obtained possession of securities from the customer within ten business days after the settlement date. The proposed rule specifically states, however, that the term "customer" shall not include broker/dealers. The proposed rule is intended to implement section 15(c)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c)(3), and is scheduled to become effective January 1, 1973. *See* CCH, Fed.Sec.L.Rep. ¶ 25,128.

There can be no question but that the extension of over $10,000,000 credit, and the artificial stimulation of the market resulting from Naftalin's short-selling scheme, are in direct conflict with section 7's objectives. *Cf.* Pearlstein v. Scudder & German, *supra,* 429 F.2d at 1147–1148 (Friendly, C. J., dissenting). Furthermore, as the District Court recognized, section 7 and Regulation T place the burden of compliance squarely and solely upon the broker/dealers. Pearlstein v. Scudder & German, *supra* at 1141; Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677, 680 (D.C.D.C.1971); 71 Colum.L.Rev. 1521, 1531 (1971).

It has been forcefully argued that granting relief to knowledgeable and deceitful investors such as Naftalin will merely exacerbate the evil by providing potential wrongdoers with a heads-I-win-tails-you-lose opportunity; *i. e.,* they can keep the spoils if their illegal schemes prove profitable and foist their losses on broker/dealers if the speculation doesn't pay off. *See* Pearlstein v. Scudder & German, *supra,* 429 F.2d at 1148 (Friendly, C. J., dissenting); Serzysko v. Chase Manhattan Bank, *supra,* 290 F.Supp. at 89–90. But, if the broker/dealer is aware that he will be saddled with liability for an unlawful extension of credit, he will surely be motivated to act diligently either to preserve his good faith belief in prompt delivery or to liquidate the transaction. Such observation and compliance with the requirements of Regulation T can only have the effect of nipping the extension of illegal credit in the bud;[22] and the broker/dealer, if he acts with genuine good faith, will bear no risk for the occasional devious investor who might slip by with his illegal scheme. There is, moreover, the threat of other penalties to deter investors who might follow Naftalin's example.[23] *See* Nathanson v. Weiss, Voisin, Cannon, Inc., 325 F.Supp. 50, 55, 57 (S.D.N.Y. 1971). We have no doubt that under section 7 and Regulation T as presently structured, a broker/dealer who has entered into a special cash account transaction in good faith, but who has not acted diligently to sustain his good faith belief that prompt delivery will be made, cannot excuse his negligence by placing all the blame upon a customer that has deceived him.[24] *See generally* Manevich v. DuPont, 338 F.Supp. 1124, 1126 (S. D.N.Y.1972); Bowman v. Hartig, 334 F.Supp. 1323, 1327 (S.D.N.Y.1971); Goldman v. Bank of Commonwealth, 332 F.Supp. 699, 706 (E.D.Mich.1971); Avery v. Merrill Lynch, Pierce, Fenner & Smith, *supra,* 328 F.Supp. at 680–681.

Even if violations of section 7 and Regulation T are ultimately found to exist, we cannot accept Naftalin's argu-

22. It is interesting and, perhaps, fitting at this point to note Naftalin's testimony that his decisions on where to place his short-sell orders were based on past experiences with regard to which firms were somewhat lax about demanding prompt delivery.

23. The SEC commenced District Court proceedings seeking permanent injunctions restraining Neil Naftalin, and Naftalin & Co., its officers and employees from violating section 10(b) of the Securities Act of 1933, 15 U.S.C. § 78j(b), and section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). The District Court recently entered final judgment for the SEC in that case, granting the relief sought. SEC v. Naftalin, et al., No. 4–69–Civil–385 (D.C.Minn., filed Aug. 29, 1972). The SEC has also instituted administrative proceedings pursuant to sections 15(b) and 15A of the 1934 Act, 15 U.S.C. §§ 78o(b) and 78o–3, seeking an order revoking Naftalin's registration and permanently barring Neil Naftalin from association with any broker/dealer.

24. We note, along with the District Court, that Naftalin is pleading the asserted violations of the broker/dealers as a defense to the broker/dealers' claims. We express no opinion as to whether our decision on these issues would be the same if the deceitful customer \ as suing the broker/dealers for damages resulting from their violations of the margin requirements.

ment on cross-appeal that the sales contracts are absolutely void under section 29(b) of the Act. *See* note 7, supra. In Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court read the language of section 29(b) as ". . . establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation. The lower federal courts have read § 29(b) . . . as rendering the contract merely voidable at the option of the innocent party. . . . This interpretation is eminently sensible." 396 U.S. at 387–388, 90 S.Ct. at 623. *See also* Goldman v. Bank of Commonwealth, *supra;* Moscarelli v. Stamm, 288 F. Supp. 453, 460 (E.D.N.Y.1968); J. Cliff Rahel and Company v. Roper, 186 Neb. 34, 180 N.W.2d 682, 684 (1970).

It may be that in the context of this case Naftalin, as the customer, cannot be the violator since, as we have seen, the onus of complying with section 7 and Regulation T is entirely upon the broker/dealers. Nevertheless, we cannot perceive how, under any stretch of the imagination, Naftalin can qualify as an "unwilling innocent party" entitled to invoke section 29(b). To absolve Naftalin of all contractual obligations after it had instigated and perpetuated these illegal schemes would be an inequitable and gratuitous result. *See* Mills v. Electric Auto-Lite, *supra,* 396 U.S. at 388, 90 S.Ct. 616, 24 L.Ed.2d 593; Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 213–214 (9th Cir. 1962).[25]

If the petitioning creditors are found to have violated section 7 and Regulation T, we think the more appropriate remedy is to limit their claims to the difference between the sale price of the securities and the price at which those securities could have been purchased if the transactions had been bought-in at the time when the implied duty of liquidation arose under section 4(c)(1)(ii) of Regulation T.

The case is remanded to the District Court for a fresh determination of what constituted a prompt delivery of securities by a customer in the position of Naftalin, doing business in a special cash account, under market conditions as they existed in August, 1969. After thus ascertaining the applicable delivery date, the court should determine whether any of the petitioning creditors took any affirmative action on or shortly after that date which would, under the circumstances, serve to sustain their good faith belief that prompt delivery from Naftalin was forthcoming. If under these guidelines the court finds that timely action was taken by the petitioning creditors to preserve their good faith belief that prompt delivery would be made, then no violations occurred and the petitioning creditors are entitled to pursue their remedy accordingly. If, on the other hand, the court finds that no such timely action was taken, then the petitioning creditors must be found to have violated section 7 and Regulation T, the remedy which we have indicated to be appropriate should be granted, and the court should determine whether any of the six petitioning creditors, thus situated, have standing to petition for involuntary bankruptcy. We think the present record is entirely adequate for full consideration and determination of these issues, but we leave to the District Court's discretion whether further evidence is indicated.

The order of the District Court is vacated and the case remanded.

25. Under these circumstances it is unnecessary for us to enter into the controversy over whether section 29(b)'s provisions apply only to contracts which by their express terms are in violation of the Act. *See, e. g.,* Pearlstein v. Scudder & German, *supra,* 429 F.2d at 1149 (Friendly, C. J., dissenting); Gregory-Massari, Inc. v. Purkitt, 1 Cal.App.3d 968, 82 Cal.Rptr. 210, 213 (2d Dist. 1969); Billings Associates, Inc. v. Bashaw, 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dept.1967); Staley v. Salvesen, 35 Pa.Dist. & Co.R.2d 318 (1963); 5 Loss, Securities Regulation 3307 (Supp.1969).