**EDWARDS & HANLY, Plaintiff,**

**v.**

**WELLS FARGO SECURITIES CLEAR-ANCE CORP., Defendant.**

**No. 75 Civ. 4566.**

United States District Court,
S. D. New York.

Oct. 4, 1978.

1112

Delson & Gordon, New York City, for
plaintiff; Evan L. Gordon, New York City,
of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for defendant; William A. Masterson, John D. Hussey, Los Angeles, Cal., Eugene F. Farabaugh, New York City, of counsel.

OPINION

GAGLIARDI, District Judge.

Plaintiff Edwards & Hanly commenced this action against the Wells Fargo Securities Clearance Corporation ("WFSCC") alleging violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, and common law fraud. Jurisdiction is predicated upon 15 U.S.C. §§ 78aa, 77v and principles of pendent jurisdiction. This action was tried to the court, and the following constitutes its findings of facts and conclusions of law pursuant to Rule 52(a), Fed.R. Civ.P. The court determines that plaintiff has proved all the elements of a § 10(b) cause of action and is entitled to recover its damages.

*Statement of Facts*

Edwards & Hanly is a New York limited partnership engaged in the business of investment banking and a registered broker-dealer of securities pursuant to § 15 of the Exchange Act, 15 U.S.C. § 78o. Defendant WFSCC, an Arizona corporation with its principal place of business in New York, is a wholly-owned subsidiary of Wells Fargo & Company, a holding company among whose subsidiaries is Wells Fargo Bank, N.A. ("WFB"). WFSCC was organized in 1970 to serve as WFB's New York clearing agent for securities transactions involving WFB's clients.

In 1974, Edwards & Hanly acquired the Huntington, New York office of duPont, Walston & Co., including the account of a customer named T. P. Richardson & Co. ("Richardson"). Richardson was a registered broker-dealer, based in Los Angeles, which specialized as an institutional broker in the so-called "third market," *i. e.,* the over-the-counter market in securities listed on the major stock exchanges. (Testimony of Richard Gulemi, Tr. 189 and Stipulation of Facts, ¶¶ 2, 5). Richardson employed approximately fifteen traders who would match buy and sell orders of large blocks of listed stocks made by large financial institutions (*e. g.,* banks, mutual funds, insurance companies and universities), without using the facilities of a national securities exchange. (Stipulation of Facts ¶ 5). Richardson made a profit equal to the difference between the price at which it purchased stock from the seller and the price at which it sold the stock to the buyer on the matched trade. (*Id.* ¶ 6). Although its traders were generally able to match buy and sell orders exactly, Richardson would at times effect an unmatched trade in order to accommodate one of its institutional clients. (*Id.,* ¶ 7). For example, if such a client wished to sell 10,000 shares of a given stock issue, Richardson would purchase the shares even though it may have been able to find buyers for only 9,000 shares. Richardson would thus buy for its own account and risk, *i. e.,* take a "long" position, 1,000 shares of stock to effect the trade. Conversely, Richardson may have found a buyer of 10,000 shares but sellers for only 9,000. To effect this trade, it would commit to deliver all 10,000 shares to the buyer and take a 1,000 share "short" position for its own account. Richardson's announced business policy was not to maintain positions, short or long, to protect its capital from market fluctuations. To eliminate these positions, Richardson would use the services of stock brokerage firms who were members of the New York Stock Exchange, including Edwards & Hanly, through whom Richardson would, as quickly as possible, sell its long positions or buy stock to cover its short positions. (*Id.*).

From February, 1974 through April 15, 1975, Richardson maintained a cash brokerage account with Edwards & Hanly on a delivery versus payment, receipt versus payment basis. (Gulemi, Tr. 189). The account both purchased and sold securities, primarily "blue chip" and "glamour" stocks listed on the New York Stock Exchange.

The orders were regularly telephoned by Richardson's traders to Dominic Gulemi of Edwards & Hanly's Huntington office. (*Id.*, Tr. 184). Edwards & Hanly's role was solely to execute the orders called in; advice was neither sought nor received from Edwards & Hanly personnel concerning any of the trades in question. The Richardson account was the largest account in plaintiff's Huntington office (O'Hare, Tr. 270), constituting 10–20% of its business (Gulemi, Tr. 217).

In 1973, in order to clear its third market trades, Richardson & Co. established a $10,-000,000 secured internal guidance draft line with WFB in Los Angeles. (Stipulation of Facts, ¶ 12). Under this draft line, WFB advanced funds for Richardson's account to a seller of securities bought by Richardson and the certificates would then be delivered to Richardson's buyer against payment of the purchase price. WFB collected interest from the time that it advanced funds for the Richardson account until it collected the purchase price from the buyer. (*Id.*) In clearing these trades for Richardson, WFB utilized WFSCC as its agent to handle the receipt and delivery of cash and securities in New York. (*Id.*; ¶ 14). At the end of each trading day, Richardson sent instructions by messenger to WFB in Los Angeles with respect to that day's matched trades on behalf of its institutional customers. WFB received from Richardson confirmation slips for both the buy and sell sides of the trade. (Bowman, Tr. 413). These instructions were then placed on bank forms by WFB's clerical personnel and forwarded by air to WFSCC in New York so that WFSCC received instructions on both sides of the trade simultaneously (*Id.*).

In a matched trade, Richardson would instruct the seller to deliver the stock to WFSCC. (Stipulation of Facts ¶ 17). Upon receipt of the stock from the seller, WFSCC would pay the seller with funds advanced to WFSCC by WFB from Richardson's draft line of credit. The stock served as collateral to WFB and WFSCC for the advance. WFSCC then notified the buyer that the stock was in its possession and, in most instances, the buyer delivered a check to WFSCC and it delivered the stock to the buyer that same day. (*Id.*)

WFSCC did not have the authority to clear any trades for Richardson without first receiving instructions from WFB. (*Id.*; ¶ 16). WFSCC's personnel, however, were permitted to contact Richardson on an informal basis if, because of the time differential between New York and Los Angeles, an early delivery of securities was made to WFSCC for which it had no instructions. (Werba, Tr. 36, 56; Holroyde, Tr. 440–41). Nevertheless, WFSCC was not to act on any informal instructions but was required to await confirmatory instructions from WFB (*Id.*, Tr. 56–57).

In the summer of 1974, Richardson fell behind in its payments to WFB of interest and service charges and WFB suspended clearing for the account (Holroyde, Tr. 436). Clearing services were resumed after Richardson and WFB entered into an agreement which required, *inter alia*, that Richardson maintain a $150,000 compensating balance in its commercial account with WFB. (Bowman, Tr. 417 & Plaintiff's Exhibit 9). Richardson's subsequent failure to meet some of the conditions set forth in the agreement prompted WFB to demand, in December 1974, that Richardson meet even more stringent conditions, including the maintenance of a $200,000 compensating balance in its account (Bowman, Tr. 418, & Exhibit 10). Richardson met these new requirements and clearing services were continued by WFB (Holroyde, Tr. 437).

Unbeknownst to WFB, early in 1974, at the direction of its president and majority shareholder Thomas P. Richardson, Richardson began to deviate from its regular practice of matching buy and sell orders and began to speculate for its own account. Richardson embarked on a program of making massive short sales of highly volatile "glamour" stocks. (Plaintiff's Exhibit # 5, Stipulation between United States of America and Thomas P. Richardson ¶¶ 25–29). By late 1974, this short-selling comprised a substantial part of Richardson's total business (Kevin Kelley, Tr. 386). In

November, 1974, Richardson employees Michael Wawra and Thomas C. Thomas met with the manager of Security Finance Corporation, a stock loan broker, to find stock lenders for Richardson in order to enable it to cover its short positions. (Plaintiff's Exhibit # 5, ¶ 32). Security Finance Corporation soon arranged for several of its clients to lend the securities in their portfolios to Richardson.

Under the terms of the stock loan agreements, lenders were to receive cash payments of not less than 100% of the closing price of the stock on its most recent trading day in exchange for the stock loaned. Such a payment is characterized as the "cash collateral" securing the stock loan. The lender is entitled to retain all profits arising from the use of the cash collateral securing the stock loan as well as all cash and stock dividends paid out by the issuer of the stock. (*Id.* ¶ 36). In order to keep the amount of cash collateral equal to the market value of the stock loaned, both Richardson and the lenders had reciprocal rights to require adjustments in the collateral called "mark-to-the-market" payments. Thus, if the value of the borrowed stock increased, Richardson would have to make a mark-to-the-market payment to the lender; the converse was also true. (*Id.*) The cash collateral necessary for Richardson to obtain and maintain these loans was obtained by creating false order tickets and confirmations which showed the stock borrowings to be stock purchases made by Richardson. (*Id.* ¶ 38). These false documents were attached to the written instructions given by Richardson to WFB for the purpose of making it appear that it was a legitimate matched trade order between institutions rather than a loan of stock to Richardson (*Id.*) Richardson's employees also concealed these short positions by making false entries on the accounts of several of its customers; fictitious purchases of various stocks were recorded to show that the firm owned the stock it was selling to brokers (*Id.* ¶¶ 30, 84, 86, 87 and Plaintiff's Exhibits 1–4). By December 31, 1974, Richardson had borrowed in excess of $25 million worth of stock from fourteen different institutions

(*Id.*, ¶ 34). All of the stocks borrowed in this manner were used to deliver on short sales previously made by Richardson (*Id.*, ¶ 35).

As a result of a rising market in the stocks which Richardson borrowed through Security Finance Corporation, Richardson was unable to meet the required mark-to-the-market payments during March and April, 1975. On April 15, 1975, Richardson advised the Securities and Exchange Commission ("SEC") of its insolvency. The SEC filed a complaint that same day alleging violations of the Exchange Act, and on April 16, 1975, a temporary receiver was appointed to take control of Richardson. As of the latter date, its stock loans were undercollateralized by almost $3 million and over $20 million worth of short sales, principally to broker-dealers like the plaintiff, were not covered by stock loans. (Plaintiff's Exhibit 5, ¶ 39). Upon notice of Richardson's insolvency, these broker-dealers were required to buy-in the securities, i. e., purchase them on the open market, to make delivery to customers who had purchased the securities from them on the New York Stock Exchange. (*Id.*) The out-of-pocket cash loss sustained by these broker-dealers—the difference between the price at which Richardson short-sold the stock and the buy-in price to the broker-dealers—was approximately $3.4 million. (*Id.*). Edwards & Hanly sustained a loss of approximately $1.4 million (Plaintiff's Exhibit 15).

Joseph C. Werba, named president of defendant WFSCC in April, 1974, was friendly with a number of Richardson's employees and would see them socially on his frequent business trips to Los Angeles. Richardson had on occasion given Werba and his family generous gifts, including airline tickets to Los Angeles and a vacation weekend on Cape Cod. (Werba, Tr. 45). Commencing in November, 1974, at Richardson's request, Werba advanced funds to Richardson from WFSCC's bank account with the Morgan Guaranty Trust Company ("Morgan Guaranty") in New York. (Werba, Tr. 27–30 & Plaintiff's Exhibit 12). These advances were made on an "interest free" basis.

Richardson never told Werba why it needed these advances (*Id.*, Tr. 64), which it used to meet its mark-to-the-market obligations. Werba did not think that the request was unusual because he knew that third-market brokers often had liquidity problems (*Id.*, Tr. 78) and because he had made a similar cash advance previously to another firm (Tr. 64). Werba knew, however, that he had no authority to make these advances without WFB's consent, and he informed neither WFB nor his superiors at WFSCC of them. (*Id.*, Tr. 27, 65).[1] The five separate advances totalled over $1 million, and were repaid except for the final advance of $500,000 made on March 31, 1975 just as Werba left the country on a family vacation. (*Id.*, Tr. 41). On or about April 1st, without Werba's knowledge, WFSCC's vice president Gary Bruno informed Ronald Hillman, a vice president of WFB and a member of WFSCC's board of directors, that the various advances had been made and that the last advance had not been repaid (Bruno, Tr. 101–04). When Werba returned from vacation on the evening of April 7th, Bruno informed him of Richardson's failure to pay. Werba then flew to California to speak to Richardson. In San Francisco, Werba was contacted by E. Alan Holroyde, senior vice president of WFB, WFSCC board chairman and Hillman's immediate superior, who directed Werba to report to WFB's auditing division to explain his actions. Werba was told that he would be placed on "leave of absence", but that he was permitted to meet with Richardson to attempt to get the advance back. (Werba; Tr. 71, 73). At a meeting in San Francisco with Kevin Kelley, Thomas Richardson and Thomas Thomas of the Richardson firm, Werba was told that Richardson lacked the funds to repay the loan (Kevin Kelley, Tr. 396). Empty-handed, Werba returned to the East Coast on April 12th and did not report to work thereafter. (Werba, Tr. 73).

One of the crucial factual issues in this case is whether Werba knew of Richardson's short-selling scheme. In early December 1974, while on a business trip to Los Angeles, Werba met two Richardson employees, cashier Michael Wawra and Treasurer Thomas C. Thomas, for dinner. Wawra explained to Werba that Richardson had begun to suffer losses on certain trades but that it did not want WFB to know for fear that WFB would terminate its draft line of credit. (Werba, Tr. 17). Thomas and Wawra persuaded Werba to aid them in concealing these trades from WFB by handling them on a "special" basis. The Richardson employees proposed that rather than follow the usual procedure of routing written instructions through WFB in Los Angeles, they would telephone delivery instructions directly to WFSCC in New York.

Several days later, Werba, Wawra and Thomas met at the Playboy Club in Century City, California and the subject of "special trades" was raised once again. At his pretrial deposition, Thomas claimed that he told Werba that Richardson wanted to establish the "special trades" procedure because it had huge short positions in several stocks and wished to make short sales without WFB's knowledge. (Thomas deposition, pp. 30–31, 56–57). Thomas was fairly certain that he told Werba of these short positions because although he and Werba were close friends, Thomas felt it necessary to explain why such an extraordinary procedure was necessary (*Id.*; p. 60). Thomas continued to say that he did not think his statements had "registered" with Werba, *i. e.*, that Werba did not quite comprehend what Thomas had told him (*Id.*, p. 62), and that he did not remember Werba making any comment concerning the proposed short sales. (*Id.*, p. 62 and 75). Werba, for his part, flatly denies that Thomas, or any other Richardson employee told him that Richardson was short in the market and desired to make "special trades" to conceal its short positions. (Werba, Tr. 21–22, 59). Contrary to the testimony of one of Richard-

---

1. Werba was able to make these advances because the WFSCC account at Morgan, to which WFB wired funds for the purpose of clearing trades generated "float" of about $10 million per day. This substantial balance arose because it took several days to clear checks issued in New York by WFSCC to pay delivered stock. (Werba, Tr. 28–29).

son's traders, Werba also denies that he was told at the San Francisco meeting during the week of April 7, 1975 that Richardson had been selling short (K. Kelley, Tr. 396; Werba Tr. 72). Werba insists that the sole rationale ever given to him for the "special trades" was the need to keep WFB unaware of the losses it had incurred on certain transactions (Werba, Tr. 17). On balance, the court does not find Werba's version of these conversations to be credible. The court concludes that Werba was informed in early December, 1974 of Richardson's short positions and its desire to hide them from WFB. The deal was finalized on or about December 10, 1974 when, over dinner with Thomas Richarson and two others, Werba received $2,000 in cash from Thomas Richardson for "helping" him out. (*Id.,* Tr. 23, 60, 77). Soon after, Werba received the money, WFSCC began to handle special trades for Richardson. Werba, of course, told neither WFB's employees nor his superiors at WFSCC what he had done. (*Id.,* Tr. 57, 60, 62). Although Werba originally thought that Richardson intended to make only five or six such trades (*Id.,* Tr. 61), from January through March, 1975, WFSCC cleared approximately 52 special trades.

Marianna Ianuzzi, a WFSCC employee in her mid-twenties, was in charge of receiving and delivering securities from WFSCC's various Los Angeles accounts, including Richardson. Her duties included speaking to the brokers who, like plaintiff, were carrying out Richardson's trades. (*Id.,* Tr. 32). She was not told what she could or could not say to these brokers with respect to trades. (*Id.,* Tr. 34). Indeed, Werba testified that he had given Ianuzzi "carte blanche" in the handling of the Los Angeles accounts, including Richardson (*Id.,* Tr. 32) and Werba's superiors eventually concluded that he had "removed himself" from his daily supervisory function. (Holroyde, Tr. 457). Werba told her of the "special trades" and told her how to handle them (Werba, Tr. 36), although it doesn't appear that Werba told her that these trades were in fact short sales. She would receive receipt and delivery instructions directly from

Richardson. Upon completion of the special trades, she sent informal handwritten confirmation statements to Richardson and retained a copy for WFSCC's files. (*Id.,* Tr. 37).

Gary Bruno, WFSCC's vice president, worked under Joseph Werba and directly supervised the work of Marianna Ianuzzi. In February or March, 1975, Bruno advised Werba that the volume of special trades had gotten too great and that the practice should be stopped. (Bruno, Tr. 99). Werba called Richardson's office and spoke to Thomas, informing him that after May 1, 1975, WFSCC would discontinue handling such trades. (Bruno, Tr. 39). Thus, WFSCC continued the practice of clearing the special trades until Richardson's demise on April 15, 1975.

As early as February, 1975, it became increasingly difficult for Richardson to secure enough stock to cover its short positions. Three of its biggest customers, E. F. Hutton, B. C. Christopher and North American Equity, informed Richardson that they were buying in their accounts with Richardson and would no longer do any business with it because of its consistently late delivery of stock that it had sold to them. (Wawra Dep., 55–57; Thomas Dep., 46–47). Thomas Richardson decided to increase the volume of short sales made through Edwards & Hanly because, by contrast, that firm had never pressed Richardson as hard to make timely delivery. (John Kelley Dep., 31). Thus, while Richardson placed almost no sale orders through Edwards & Hanly in February, 1975, it sold large amounts of stock through that account thereafter. Commencing on or about March 3, 1975 and continuing until April 7, 1975, Richardson sold 23,000 shares of Digital Equipment Corporation, 9,500 shares of E. I. duPont & de Nemours & Co., 2,600 shares of Fairchild Camera Co., 17,500 shares of Halliburton Corp. and 18,500 shares of Texas Instrument Corp. in its cash account with Edwards & Hanly. Virtually all of these sales were short sales. (Defendant's Exhibit A).

Richardson's increasing inability to deliver sold securities promptly created problems for WFSCC and Marianna Ianuzzi. Brokers who were anxious to secure delivery in the face of a rising market began to call her to find when delivery would be made. She, in turn, called Richardson to determine the reason for the delay. At his pre-trial deposition, Richardson's cashier Michael Wawra testified that there came a time when, after giving her may false excuses for late delivery, he finally broke down and told Ianuzzi that certain trades were short sales. Wawra's recollection of the circumstances under which he told her of the practice was hazy. At first, Wawra stated that he remembered one occasion in February or March 1975, during a period when the market was rising and he could not borrow that he had told her that a given trade was short (Wawra Dep., 32–33). Wawra subsequently testified that he originally told her of the shorts in January at a time when he was physically ill. (Wawra, Dep. 73–4). Wawra then said he recalled between two and five such conversations, and, finally, between three and seven such conversations, about specific trades (*Id.*, Dep. 85–7, 93). Wawra admitted, however, that he continued to give excuses to Ianuzzi until the very last day and would lie to her about the lateness of various trades (*Id.*, Dep. 77, 93–4). Joseph Werba claims to remember that in July, 1975, following the dismissal of Ianuzzi and himself by WFSCC, Ianuzzi said that she knew that certain sales were short sales and that she assumed Werba knew as well.[2] (Werba, Tr. 46). When pressed, however, Werba admitted that he really could not remember what she had said about short sales. (*Id.*, Tr. 48).

Wawra and other Richardson employees were similarly successful at keeping Edwards & Hanly at bay. Richardson had always been late in delivering securities to Edwards and Hanly. The standard sale contract between brokers in the industry required delivery within five business days in a delivery versus payment/receipt versus payment account (Defendant's Exhibit A). Through March, 1975, Edwards and Hanly tolerated delays by Richardson of two to three months in some extreme cases, and delays of two to three weeks as a regular practice. (*Id.*) There was testimony at trial to the effect that, as a matter of trade custom, brokers often tolerated delays of three or four weeks (Monigan, Tr. 575); lengthier delays were expected from third-market brokers than from retail customers because third-market brokers, in turn, often had to wait for delivery from their institutional customers. (Foote, Tr. 326–27). No rule or practice precluded Edwards & Hanly from buying in an account once the date on which delivery was due had passed. (Peake, Tr. 527). Nevertheless, Edwards & Hanly had an obvious disincentive to buy in the account because the account generated substantial brokerage commissions. (Edwards, Tr. 501). Thus, when Richardson went under on April 15, 1975, Edwards & Hanly was required to buy-in over thirty failed trades, almost two thirds of which were at least three weeks past due. (Defendants' Exhibit A). Almost ninety per cent of the short sales which plaintiff had to buy-in were made by Richardson in March, 1975. (*Id.*)

The registered representative at Edwards & Hanly in charge of the Richardson account, Dominic Gulemi,[3] testified that the

---

**2.** At trial, counsel for WFSCC objected to the admissibility of this statement on hearsay grounds. Counsel correctly argued that because Ianuzzi and Werba were no longer employed by WFSCC, her statement was not "a statement by [a party's] agent or servant concerning a matter within the scope of [her] agency or employment, made during the course of the relationship." Rule 801(d)(2)(D), Fed.R. Evid., and thus not an admission by WFSCC. Nevertheless, the statement is admissible as an exception to the hearsay rule as a statement of

Ianuzzi's then existing state of mind. Rule 803(3), Fed.R.Evid. A statement of the declarant's present state of mind is admissible to prove a past state of mind in issue. *See United States v. DeCarlo,* 458 F.2d 358, 364–65 (3d Cir.), *cert. denied,* 409 U.S. 843, 93 S.Ct. 107, 34 L.Ed.2d 83 (1972); McCormick on Evidence § 295, at 696 (2d ed. 1972).

**3.** Gulemi, not unlike Werba, maintained close personal relationships with many Richardson employees. In 1974, he took three trips to California, including one during which he and

account did not begin to encounter any problems with late deliveries until the latter part of 1974. Informed by the firm's margin clerk that Richardson had two very late outstanding deliveries, Gulemi contacted Wawra and delivery of the stock followed soon after. (Gulemi, Tr. 194–96).[4] Understandably, Edwards & Hanly's personnel did not become truly concerned with Richardson's late deliveries until the last week of March, 1975 when Edwards & Hanly transferred the clearing functions for its retail accounts to another firm and retained clearing functions over only institutional clients. (Edwards, Tr. 139; Foote, Tr. 342). Managing partner Bert Edwards, concerned with the large credit balance that the firm was required to carry on its books due to Richardson's failure to deliver,[5] sought assurances from his subordinates that Richardson would make good on delivery. In late March, however, the account was not "at risk" for a substantial sum; the difference between the price at which Richardson sold undelivered stock and its market price on a given day hovered between $100,000 and $200,000. Edwards determined that buying in the account was not yet necessary. (Defendant's Exhibit B and Edwards, Tr. 144).

On April 7, 1975, an Edwards & Hanly margin clerk named Mulholland calculated that Richardson owed the plaintiff over $7 million in stock and informed Gulemi of the situation. (Gulemi, Tr. 205). Gulemi immediately contacted Wawra, who falsely attributed the delay to the failure of Richardson's clients to deliver it stock and promised delivery within a week. (Id., p. 206). Gulemi then contacted O'Hare, manager of the Huntington office, and for the first time suggested that a principal of the Edwards & Hanly firm contact Richardson and demand delivery (Id. Tr. 208, 237). O'Hare subsequently spoke to Wawra, but found him to be evasive (O'Hare, Tr. 261). At no time did any Richardson employee tell any Edwards & Hanly employee that any sales made by Richardson were short sales. From April 7th onward, plaintiff's net risk position on the Richardson account increased substantially due to a rapidly increasing market. The total net risk to Edwards & Hanly moved from approximately $200,000 on the 7th, to over $450,000 on the 9th, to over $1 million on the 14th and $1.3 million on the 15th. (Defendant's Exhibit B).

Defendant's expert witness Francis Monigan, then an assistant vice president with the firm of Dean Witter & Co., testified that in his opinion, by February, 1975, the reasonably prudent broker would no longer maintain a good faith belief that Richardson had a long position in the stocks it sold. (Tr. 569). In his opinion, the reasonably prudent broker would have commenced buying-in the account on March 7, when the net risk to Edwards & Hanly was over $30,000 and two Richardson sales of Halliburton Co. stock had failed. (Tr. 570–71). Another defendant's expert, Junius Peake, took an even more cautious approach to Richardson's late deliveries and testified that by late November, 1974 a reasonably prudent broker could no longer believe in good faith that Richardson was selling long. (Tr. 515–22). By that date, approximately 10,000 shares of Halliburton, 2,000 shares of DuPont and 5,000 shares of Schlumberger stock were owing to plaintiff (Defendant's

the Richardsons planned a joint venture—the establishment of a restaurant business in Los Angeles. (Gulemi, Tr. 191–93).

4. It is highly doubtful, however, that this transaction occurred in November or December as Gulemi testified because Edwards and Hanly's records show no deliveries of stock on extraordinarily late trades during those months. (Defendant's Exhibit A).

5. The credit balance—a charge against the firm's capital—resulted from the accounting re-

quirement that Edwards & Hanly carry the amount it owned Richardson for stock sold as an account payable even though the firm was technically not obligated to pay out any cash until Richardson made delivery. (Edwards, Tr. 161). Richardson's sales accounted for a large percentage of the firm's total credit balance after the transfer of the retail accounts on March 27th. (Foote, Tr. 343). It was not until the transfer of those accounts that the Richardson balance "stuck out like a sore thumb." (Id.)

Exhibit B). Peake felt that Richardson's repeated lateness of delivery was inconsistent with its role as a third market broker because the buyer on a matched trade generally wants his stock promptly. (Peake, Tr. 518–19).

In the last few weeks before Richardson's demise, Edwards & Hanly made persistent inquiries of WFSCC personnel in an effort to secure delivery of stock. John Stokes, a back office employee, called Marianna Ianuzzi once a day during the last two weeks in March. Each conversation followed the same pattern: he would ask her if Edwards & Hanly would be receiving any securities that day for Richardson's account; she would say she had not received the stocks, but promised to contact him when she received them (Stokes, Tr. 374–75). Plaintiff's head cashier Arthur Foote inquired after various late items in late March and early April (Foote Tr. 305–08), and again on April 15th (Foote, Tr. 312). On the latter occasion, Ianuzzi informed him that she had several open items but was expecting the delivery of some Schlumberger Corp. stock, which stock eventually cleared. On April 14, 1975, and again on the afternoon of April 15th, Hugh O'Hare, manager of plaintiff's Huntington office, called and spoke to Ianuzzi to ask if she had instructions to deliver specific securities. She indicated that she had instructions but, as yet, no stock to deliver. (O'Hare, Tr. 262–64, 287). Similar conversations ensued between Ianuzzi and Robert Della Vecchia, plaintiff's head cashier in the New York office in March, 1975 with respect to late deliveries generally. (Della Vecchia, Tr. 357–58). In each of these conversations, Ianuzzi stated that she had no stock to deliver, but that she would call plaintiff when she received it. In none of these conversations did she state that she either knew or suspected Richardson was selling short. In early April, Della Vecchia spoke to Anthony Sorrentino, a stock loan officer employed by another firm, who told him that he had heard a rumor that Richardson was in bad

financial condition and may have been short stock (Della Vecchia, Tr. 359–61). On or about April 10, Della Vecchia called Ianuzzi to inquire about the delivery of stock. He mentioned the rumor to her but she dismissed it as being "just a rumor" and stated that she felt plaintiff would get its stock. (*Id.*, Tr. 360).

WFSCC's personnel in New York were subject to the control of certain WFB officers, headquartered in San Francisco, who also served on WFSCC's board of directors.[6] A detailed procedural manual served as a guide for WFSCC's employees (Defendant's Exhibit I). It authorized WFSCC, as WFB's agent, to act only upon the direct instructions of WFB's securities industry department as specified on both securities receipt forms and securities delivery forms. WFSCC could accept delivery against payment only if it had a securities receipt form from WFB containing the same information as the delivery bill which accompanied securities delivered in by a broker-dealer. If the information differed or if WFSCC lacked a receipt form, it could not accept delivery against payment without WFB confirmation. Because of the time lag between New York and California, WFSCC was permitted to investigate such discrepancies by contacting WFB's customer, but it was never authorized to rely on customer advice without receiving WFB confirmation. Without such confirmation, WFSCC was obligated to reject the delivery and return the securities to the delivering party. Each morning, WFSCC would wire WFB information regarding all securities received that day. If the delivery of securities to WFSCC was in accord with a receipt form in its possession the wire would serve as a basis for WFB to fund WFSCC's bank account in New York. If WFSCC received a delivery for which it had no form or on which the information on the receipt form differed from that on the delivery bill, WFB would investigate the discrepancy.

---

**6.** Until February, 1975, one Mr. Reichart served as WFSCC's chairman. E. Alan Holroyde, a WFB Vice President, replaced him. Holroyde and Ronald Hillman, a WFB vice president and WFSCC officer, supervised Werba. (Tr. 445).

Monthly meetings of WFB's securities industry department were held in California and WFSCC representatives, generally either Werba or Bruno were required to attend and report on WFSCC's business (Holroyde, Tr. 437). In 1974, WFB learned that Werba had violated the procedures set forth above by accepting changes in delivery instructions from brokers directly rather than waiting for WFB's instructions. (*Id.*, 438–39). At a meeting of the securities industry department, WFB's policy of requiring WFSCC to act solely at WFB's direction was reaffirmed. (*Id.*)

WFSCC's monetary operations were also subject to some controls. For trades on which WFSCC had instructions, it would issue its check for the securities in clearing house funds available on the next day. To insure that WFSCC had sufficient funds in its account at Morgan Guaranty to cover checks issued that day, WFB would wire, in immediately available federal funds, the exact amount to the Morgan Guaranty account necessary to cover the checks issued for securities received in that day. (Holroyde, Tr. 450).

Because WFSCC's account was funded with immediately available federal funds but the checks that were drawn on the account were paid in clearing house funds available the next day, there was a continual lag in WFSCC's account. This lag, or "float", was intentionally designed to provide WFSCC with an investment opportunity. The continual lag was used for investment in commercial paper and certificates of deposit (Holroyde, Tr. 447). It was this lag which created funds from which Werba made unauthorized advances to Richardson.

Each day WFSCC would prepare a money control sheet for all financial transactions through its Morgan Guaranty account. These sheets provided a basis for determining the amount available for overnight investment. They were reconciled weekly to the Morgan Guaranty statement by WFSCC employees and were audited on a yearly basis by WFSCC's auditors. (*Id.*, Tr. 452–53). The daily money sheets were sent to WFB, but not to the directors of WFSCC

working in San Francisco who were charged with supervision of WFSCC. (*Id.*, Tr. 453–6). WFSCC's directors in San Francisco received monthly statements from Morgan but those statements did not identify individual deposits and withdrawals from the Morgan account. (Tr. 447–48).

*Discussion*

The complaint alleges that WFSCC is liable to plaintiff either as a direct participant in Richardson's scheme or as an aider and abettor to Richardson and others. (Complaint, ¶ 23). It is clear, however, that the allegedly fraudulent sales were between Richardson and the plaintiff. The true gist of Edwards & Hanly's allegations is that WFSCC's employees aided Richardson in the commission of fraud; if WFSCC is liable at all, it is under theories of secondary liability.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court explicitly refused to decide whether § 10(b) and Rule 10b–5 may give rise to aiding and abetting liability. *Id.* at 192 n.7, 96 S.Ct. 1375. Since *Hochfelder*, however, the Court of Appeals for this Circuit has held that these provisions do permit the imposition of aiding and abetting liability. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir. 1978); *Hirsch v. duPont*, 553 F.2d 750, 759 (2d Cir. 1977). This court's initial task, therefore, is to evaluate the conduct of WFSCC's employees Werba and Ianuzzi to determine whether either of them may be said to have aided and abetted a § 10(b) violation.

The elements that a plaintiff must prove to impose liability upon an aider and abettor are well established: (1) that the primary party, here Richardson, as distinguished from the secondary aiding and abetting party, committed a securities law violation; (2) that the aider and abettor knew of the violation; and (3) that the aider and abettor substantially assisted in effecting the violation. *Rolf v. Blyth, Eastman Dillon & Co., supra*, 570 F.2d at 47–48; *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct.

826, 42 L.Ed.2d 837 (1975); *cf. Rochez Bros. Inc. v. Rhoades,* 527 F.2d 880, 886 (3d Cir. 1975); *Landy v. Federal Deposit Ins. Co.,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (proof of "wrongful act" by primary wrongdoer suffices for first element).

The first requirement of the test poses little difficulty in the instant case. Although selling short does not violate § 10(b) in and of itself, the seller's willful failure to disclose his short position is another matter. The record clearly warrants a finding that Richardson defrauded Edwards & Hanly within the meaning of § 10(b) and Rule 10b–5.[7] Plaintiff has shown all of the elements of an implied right of action under § 10(b): a willful misstatement or omission of a material fact which caused him injury in connection with his purchase or sale of a security. *See Santa Fe Industries Inc. v. Green,* 430 U.S. 462, 474 n.14, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (material misstatement or omission required); *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 197, 96 S.Ct. 1375 (knowing or intentional misconduct required); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730–731, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (plaintiff must be purchaser or seller of securities). Thomas Richardson instructed his employees to conceal the fact that their firm was selling short; the willfulness of the omission is clear. Moreover, whether or not the firm possessed the stock it sold was an "omitted fact [which] would have assumed actual significance in the deliberations of the reasonable [purchaser];" the omission was thus "material." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132,

48 L.Ed.2d 757 (1976). Finally, Richardson's actions obviously "caused" plaintiff's injury. Where, as here, the defendant's conduct involves primarily a failure to disclose "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1975). "[T]he proper test to determine whether causation in fact has been established in a non-disclosure case is 'whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact.'" *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 239 (2d Cir. 1970) (citations omitted).[8]

The second requirement for establishing an aiding and abetting violation is the secondary party's knowledge of the primary violator's fraud. *Hochfelder's* basic holding that scienter is an element of the § 10(b) cause of action, "also establishes the standard for aiding and abetting liability." *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 44. One of the questions left open by the *Hochfelder* decision was whether "recklessness" satisfies that standard. The Second Circuit partially answered this question in *Rolf,* by holding that at least in situations in which the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness will suffice. 570 F.2d at 44. Although the Court of Appeals did not reach the question of whether recklessness satisfies the scienter requirement where the alleged aider and abettor does not owe a duty of disclosure and loyalty to the defrauded party, *id.* at 44 n.9, its opinion intimates strongly that "recklessness" may constitute scienter even in the absence of a fiduciary relationship.[9]

7. Federal jurisdiction under § 10(b) turns on the "use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange." 15 U.S.C. § 78j. Richardson's use of the telephone suffices to confer federal jurisdiction. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 93 n.19 (5th Cir. 1975).

8. Because the conduct engaged in by Richardson resulted in plaintiff buying in securities for

Richardson's account and risk, but with loss of funds not presently recoverable from Richardson, the court concludes that plaintiff was a "purchaser" for the purposes of § 10(b). *See Weitzman v. Stein,* 436 F.Supp. 895, 901–02 & n.6 (S.D.N.Y.1977).

9. In *Rolf,* the alleged aider and abettor was a registered representative employed by a registered broker-dealer. 570 F.2d at 41. The special obligations of broker-dealers to their cus-

Thus, even though banks and stock transfer agents have no special duty of disclosure, *see Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 & n.29 (5th Cir. 1975); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151–52, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), this court will analyze the actions of WFSCC's employees under a "recklessness" standard.

Evidence of knowledge may be shown circumstantially, but the proof must demonstrate either actual awareness of, or the reckless failure to discover, the primary violator's fraudulent scheme. *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 47; *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 96. "[K]nowledge of the fraud, and not merely the undisclosed material facts, is indispensable." *Hirsch v. duPont, supra,* 553 F.2d at 759. *Accord, Murphy v. McDonnell & Co.,* 553 F.2d 292, 295 (2d Cir. 1977).

This court has already concluded that WFSCC's president, Joseph Werba, knew that the reason Richardson wished to institute "special trades" was its massive short stock position. Given Werba's long experience in the securities field and his knowledge of Richardson's business, the court further concludes that Werba knew that Richardson was defrauding broker-dealers by failing to disclose its short position or, at least, recklessly failed to discover Richardson's fraud. Even if Richardson's employees did not expressly tell Werba that they planned to disguise their trades as "long", Werba must have known that this was their intent. Affiliated with WFSCC from its inception, Werba knew that Richardson's accounts with various brokerage firms were cash delivery-versus-payment accounts and, should have known that short sales could not legally be made in such accounts. Even if Werba thought, at the outset, that Rich-

ardson fully intended to disclose its short positions to its purchasers, Werba recklessly failed to discover that Richardson had not done so. Having established a procedure designed to facilitate Richardson's short-selling, Werba persisted in the delegation of all responsibility over the Richardson account to Ianuzzi. Thus, Werba effectively insulated himself from broker-dealer complaints concerning late delivery which, given his knowledge of Richardson's short trading, would have put him on notice that the broker-dealers were the victims of fraud. Werba must thus be charged with knowing that the real nature of Richardson's trades was hidden not only from WFB, but also from the broker-dealers to whom Richardson short sold stock.

As to Marianna Ianuzzi's state of mind, however, the sole testimony implicating her is that of Michael Wawra, Richardson's cashier. Wawra could not recall whether he had told Ianuzzi of the short sales only once or as many as seven times. Wawra's conflicting versions of what he told Ianuzzi and how often he told her, render his credibility suspect. Even if the court were to find that at some point in time Wawra told Ianuzzi that certain of the sales were shorts, it is by no means clear that Ianuzzi was aware of the pervasive nature of the scheme. Wawra admits that, until the very end, he continued to give Ianuzzi the very same excuses for late delivery that he offered to Gulemi, Edwards & Hanly's representative. Until Richardson's demise, therefore, Ianuzzi remained as much a target of its fraudulent assurances as was Gulemi. Ianuzzi undoubtedly knew that the Richardson trades were not being handled in the conventional manner, and that Richardson was late in its deliveries. These facts, in and of themselves, however, are

tomers to investigate and disclose have long been recognized. *Hanly v. SEC*, 415 F.2d 589, 595–96 (2d Cir. 1969); *see Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 97 n.28. The *Rolf* court however did not premise its holding solely upon the nature of the registered representative's relationship to his customer. Rather, the court read *Hochfelder's* definition of scienter, "knowing or intentional misconduct,"

to permit the imposition of liability, for conduct less directed than "intentional" activity. 570 F.2d at 45. Moreover, the court found the recklessness construction to be "consistent with if not demanded by, precedent in this circuit." *Id.* at 46. *Rolf* thus clearly implies that even in the absence of fiduciary obligations, the reckless defendant may incur § 10(b) liability.

insufficient to show either that Ianuzzi actually knew the trades were short or that Richardson's short-selling was so obvious that she must have known of it.

■■■ The third and final element of aiding and abetting liability is "substantial assistance" of the primary violation. The nature of the assistance rendered by the alleged aider and abettor relates to the knowledge element where, as here, there was no independent duty to disclose. *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 97; *H. L. Federman & Co. v. Greenburg,* 405 F.Supp. 1332, 1337 (S.D.N. Y.1975).

> In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case, the assistance must be substantial before liability can be imposed under 10b–5.

*Woodward v. Metro Bank of Dallas,* 522 F.2d at 97. As to Ianuzzi's conduct, the evidence reveals nothing more than "the daily grist of the mill"; it was her responsibility to discuss outstanding deliveries with broker-dealers. Absent clearer proof of conscious intent to violate the securities laws, her mere failure to disclose what she knew of Richardson's actions is not actionable. *Id.; SEC v. Coffey, supra,* 493 F.2d at 1317. Having found that Werba knew of the Richardson scheme, however, the court has little trouble finding that Werba "sub-

stantially assisted" Richardson in perpetrating its fraud. Werba's unauthorized actions—advancement of interest free funds to Richardson and processing its trades without WFB's approval—hardly constituted typical business transactions. Moreover, Werba's acts were a "substantial causal factor in the [perpetration] of [Richardson's] fraud and in the cumulation of [Edwards & Hanly's] losses." *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 48; *Landy v. Federal Deposit Ins. Co., supra,* 486 F.2d at 163. Had Werba not acquiesced in the "special trade" arrangement and advanced the interest-free funds, Richardson would not have been able to conceal or to finance its massive short sale speculation. After considering plaintiff's proof in light of the established elements of the aiding and abetting theory, the court concludes that Joseph Werba aided and abetted Richardson's fraudulent scheme.[10]

■■■ Given Werba's complicity in the Richardson scheme, the court must next determine whether liability may be imputed to WFSCC. The two principal sources of vicarious liability asserted against employers of those who commit or participate in securities fraud are the common law doctrine of respondeat superior and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

**10.** The court nevertheless dismisses that portion of the complaint which seeks to recover for violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). The Court of Appeals for this circuit stated several years ago that the question whether § 17(a), a criminal provision, may be the source of an implied private right of action was an open question. *Globus v. Law*

*Research Service, Inc.,* 418 F.2d 1276, 1283 (2d Cir. 1969). Since that time, however, this district has repeatedly held that no such cause of action exists, *see e. g., Scarfarotti v. Bache & Co.,* 438 F.Supp. 199, 207 (S.D.N.Y.1977); *Architectural League of New York v. Bartos,* 404 F.Supp. 304 (S.D.N.Y.1975), and this court adopts the reasoning set forth in those cases.

There is some disagreement among the circuits, see *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 48 n.17 and cases cited therein, over the extent to which § 20(a) precludes the availability of common law theories of agency in this context. The distinction is "not entirely esoteric" because under the statute, unlike at common law, there is a defense of "good faith." *Plunkett v. Dominick & Dominick,* 414 F.Supp. 885, 887 (D.Conn.1976).[11]

The tension between common law agency principles and § 20(a) has not been fully resolved in this Circuit. In *SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975), the Court of Appeals held that at least with respect to SEC enforcement actions, § 20(a) was not intended as the sole measure of employee liability. *Id.* at 812. The court analyzed the legislative history of the section and determined that Congress did not intend § 20(a) to supplant common law agency principles. *Id.* On the facts before it, the court found that a brokerage firm whose vice president in charge of trading acted with apparent authority was subject to an SEC injunction for his fraudulent activities. *Id.* at 813. The court, however, carefully limited the scope of its holding:

> We need not decide today whether the entire corpus of agency law is to be imported into the securities acts for all purposes . . . [W]e intimate no view as to other cases which may involve lesser employees, actions for damages, other agency principles or respondeat superior, which may be broader than the apparent authority involved here. Such cases may involve entirely different policy considerations that are best consigned to future resolution.

*Id.* Subsequently in *SEC v. Geon Industries, Inc.,* 531 F.2d 39 (2d Cir. 1976) the court declined to extend *Management Dynamics* to require the imposition of respondeat superior liability upon a brokerage firm whose registered representative had violated the securities laws. The court held

that, absent a showing of inadequate supervision by the firm, respondeat superior liability would not lie. *Id.* at 54–56. As in *Management Dynamics,* however, the court made clear that it "intimate[d] no view as to cases with different facts." *Id.* at 55.

On the facts of this case, this court need not resolve "the rather thorny controlling person-respondeat superior issue." *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 48 n. 19. Under either theory, WFSCC may be found liable for Werba's acts. At common law, WFSCC is liable as a principal for the tortious acts of Werba, its agent, so long as those acts are found to be "within the scope of employment." *Fey v. Walston & Co.,* 493 F.2d 1036, 1052 (7th Cir. 1974); *Lewis v. Walston & Co.,* 487 F.2d 617, 623–24 (5th Cir. 1973). That Werba's actions were unauthorized is not determinative of whether they were taken "within the scope of employment." *Lewis v. Walston, supra.* The Restatement (Second) of Agency defines "the scope of employment" as follows:

> § 229. Kind of Conduct within Scope of Employment
>
> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
>
> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;

---

11. In some circumstances, of course, § 20(a) is a broader theory of secondary liability than common law agency notwithstanding the "good faith" defense. It is unnecessary under this section to establish the common law relationship of principal and agent or employer and employee. *Moscarelli v. Stamm,* 288 F.Supp. 453, 460 n.5 (E.D.N.Y.1968).

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Insofar as Werba's institution of the "special trade" arrangement concerned the processing of Richardson's trades generally, his conduct was "within the enterprise" of WFSCC and "similar in quality" to the acts he was routinely authorized to perform. As to both the special trades and the furnishing of the interest-free advances, Werba clearly used his position as WFSCC's president, including his access to and control over WFSCC's bank account and WFSCC's employees, to provide these services to Richardson. To this extent, the "instrumentality by which the harm [was] done [was] furnished" by WFSCC to Werba. As to Werba's purpose in providing these services to Richardson, his principal motive was to benefit both Richardson and himself, rather than WFSCC, his employer. It seems likely, however, that Werba also sought to maintain Richardson's good will and preserve a profitable account for WFB, WFSCC's parent. That WFSCC received no direct financial benefit from Werba's actions is not of controlling importance. *Lewis v. Walston, supra,* 487 F.2d at 624. In sum, Werba's unauthorized conduct was sufficiently similar to his authorized duties to be "within the scope of his employment" and WFSCC would incur liability under common law agency theories.

■ Under Section 20(a), WFSCC fares no better. It is clear that WFSCC "controlled" Werba within the meaning of this section. "The issue of 'control' is a complex fact question which requires an examination of the relationships of the various alleged 'controlling persons' to the person or entity which [is] alleged to have violated the Act." *Sun First National Bank of Orlando v. Miller,* 77 F.R.D. 430, 439 (S.D.N.Y. 1978) (citation omitted). There is no statutory definition of control, but the courts "have given heavy consideration to the power or potential power to influence and control the activities of a person as opposed to the actual exercise [of power]." *Rochez Bros., Inc. v. Rhoades; supra,* 527 F.2d at 890–91. Although the cases have recognized that controlling persons cannot be expected to exercise the same degree of supervision over corporation presidents as over lesser employees, *see, e. g., Moerman v. Zipco, Inc.,* 302 F.Supp. 439, 447 (E.D.N.Y. 1969), *aff'd per curiam,* 422 F.2d 871 (2d Cir. 1970), Werba was accountable to WFSCC's chairman in the corporation hierarchy, reported to him on a monthly basis at securities industry department meetings, had been reprimanded by him previously for acting on a broker's delivery instructions without WFSCC confirmation and was ultimately fired by him for his role in the events that precipitated this lawsuit.

■ The burden thus falls upon WFSCC to prove its "good faith." *Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 212 (D.Mass.1978); *Gordon v. Burr,* 366 F.Supp. 156 (S.D.N.Y.1973), *modified on other grounds,* 506 F.2d 1080 (2d Cir. 1974). Only those "who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons" *Lanza v. Drexel Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc), are meant to come within the ambit of § 20(a). *Accord, Rochez Bros. v. Rhoades, supra,* 527 F.2d at 890; *Gordon v. Burr,* 506 F.2d 1080, 1085–86 (2d Cir. 1974). "Knowledge is the key to the assertion of good faith . . . . Those who neither know or have reason to know of an agent's misdeeds are not liable as control persons." *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 533 (S.D.N.Y.1977). If the fraud went undiscovered because of

the controlling person's willful or reckless disregard, the good faith defense is unavailable. *Lanza v. Drexel & Co., supra,* 479 F.2d at 1306. Constructive knowledge may be shown if inadequate precautionary mechanisms were established to prevent the fraud. *Barthe v. Rizzo,* 384 F.Supp. 1063, 1069 (S.D.N.Y.1974).

There is no question that Werba's superiors did not know of Richardson's short sales until its collapse and, moreover, did not even know of Werba's unauthorized action until WFSCC vice president Gary Bruno alerted them to it on or about April 1, 1975. The case thus turns upon the adequacy of the company's supervision of Werba. On the record before it, the court concludes that WFSCC's precautionary mechanisms were inadequate.

As discussed previously, if WFSCC did not receive securities receipt and delivery forms on a given delivery, or if the information on the forms did not correspond to the delivery bill accompanying the stock, WFSCC was supposed to wire WFB's securities industry department for confirmation. Until and unless confirmation was received, WFSCC was not to accept delivery. WFSCC was further required to wire WFB information concerning all securities received each morning. If delivery was in accord with a securities receipt form in WFSCC's possession, the wire served as a basis for WFB to fund WFSCC's bank account with sufficient funds to make the "purchase" from the broker making delivery. If delivery was made for which WFSCC had no receipt form, WFB would investigate and, if possible, confirm the trade. On deliveries for which there was a receipt form, or on which WFB sent confirmation, WFSCC was to send a wire on the following day indicating that the stock had been redelivered to the purchasing broker pursuant to a securities receipt form.

As is evident from this description of WFSCC's operations, however, there was no safeguard whatsoever against WFSCC's handling of trades without the requisite forms or confirmations. Nothing in the procedure outlined served to notify WFSCC's directors whether delivery had been accepted on stocks for which no instructions had been sent. In light of Werba's prior history of contacting brokerage firms directly and acting on their instructions without WFB's confirmation, WFSCC's directors were obviously aware of the need for some independent verification that Werba and the WFSCC staff acted only pursuant to WFB's instructions. The monthly meetings at which Werba was occasionally reminded of his responsibility in this regard were not a sufficient safeguard against his failure to comply.

WFSCC's controls over Werba's monetary powers were similarly deficient. To be sure, there was a legitimate business purpose for generating float in WFSCC's bank account—investment in the money market. It appears, however, that Werba's superiors at WFSCC did not receive the company's daily money control sheets or, better still, an itemized bank statement from Morgan Guaranty indicating how that float was invested. The full extent of their supervision of the bank account's activity consisted of the review of monthly statements from Morgan which failed to itemize deposits and withdrawals and the routine yearly audit of WFSCC's books. This inadequate supervision of Werba's investment pattern enabled him to loan Richardson over $1 million interest free, between November, 1974 and March, 1975 without his superior's knowledge.

WFSCC has, in short, failed to sustain its burden of proving "good faith." Even if § 20(a) ought to govern WFSCC's conduct instead of common law agency doctrines, the court finds WFSCC to be derivatively liable for Werba's aiding and abetting of Richardson's fraudulent conduct.

WFSCC has raised several affirmative defenses which it claims must bar, or at least limit, the extent of Edwards & Hanly's recovery. WFSCC's principal contention is that Edwards & Hanly failed to exercise "due diligence" in the handling of the Richardson account and that it either knew, or should have known, of Richard-

son's short-selling scheme.[12] There is not a shred of evidence, however, that any Edwards & Hanly employee actually knew of Richardson's scheme. Dominic Gulemi, the plaintiff's registered representative in charge of the Richardson account, maintained close personal relationships with several Richardson employees, but there is simply nothing in the record to suggest that Gulemi was privy to the scheme. The real issue presented is whether Edwards & Hanly should have known of it.

WFSCC points to various factors which it claims should have alerted Edwards & Hanly to Richardson's short-selling. From November, 1974 through April 15, 1975, sell orders predominated greatly over buy orders. This high concentration of sell orders, WFSCC argues, was inconsistent with Richardson's business as a "third market broker"; it was highly unlikely that so many of Richardson's matched trades would be uneven, thereby requiring it to dispose of overages. Almost all of the deliveries of stock on these sell orders were made after the due date. Moreover, in March, 1975, Edwards & Hanly accepted a large number of sell orders for large blocks of stock when prior sell orders for the same stock had been executed shortly before and some of these prior orders were already in a "fail" position.

The court concludes, however, that the activity in the Richardson account was not so unusual as to charge plaintiff with a lack of diligence in discovering the fraud. Although Richardson was continually late in making deliveries, several witnesses, including defendant's expert Monigan, testified that delays of over three weeks were customarily tolerated in the industry. Only a small percentage of the Richardson sales

orders in the six stocks that failed were over three weeks late. Except for one egregiously late fail in Texas Instruments stock, the oldest sale which Edwards & Hanly was eventually required to buy in settled on March 10, 1975—35 days before the Richardson insolvency. Nor was the high concentration of sale orders in March, 1975 necessarily indicative of short-selling. The account had been similarly active in November and December 1974 and only a small percentage of the deliveries made during those months were uncharacteristically late by industry standards. It is significant to note, moreover, that Richardson was able to deliver a large block of stock to plaintiff as late as April 7, 1975—just one week prior to its collapse. (Defendant's Exhibit C). In light of the long standing relationship between plaintiff's representative and Richardson, the continual assurances by Richardson to plaintiff's employees in March and April 1975, and the history of late deliveries in the account, the court concludes that it was not unreasonable for plaintiff to believe that Richardson was executing legitimate matched trades. In this regard, the court specifically discredits the testimony of both of defendant's expert witnesses. The court finds that the activity of the Richardson account was not such as to put Edwards & Hanly on notice of Richardson's short-selling.

■ Defendant also contends that Edwards & Hanly violated Regulation T, 12 C.F.R. § 220.4, in its handling of the Richardson account and that this, too, should bar recovery. Regulation T, promulgated by the Board of Governors of the Federal Reserve System pursuant to § 7 of the Exchange Act, 15 U.S.C. § 78g,[13] states in pertinent part:

**12.** Since *Hochfelder*, a number of circuits have reevaluated the "due diligence" defense to § 10(b) claims and have held that plaintiff's contributory fault must be tantamount to wanton, reckless conduct to bar recovery. In these circuits, plaintiff's mere negligence is no defense. *Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Dupuy v. Dupuy*, 551 F.2d 1005, 1017–20 (5th Cir. 1977); *Holdsworth v. Strong*, 545 F.2d 687,

692–93 (10th Cir. 1976). In the Second Circuit, however, plaintiff's negligence may preclude, or at least limit, his recovery. *See Hirsch v. duPont, supra*, 553 F.2d at 763; *NBI Mortgage Investment Corp. v. Chemical Bank*, Fed.Sec.L. Rep. ¶ 96,066, at 91,799 (S.D.N.Y.1977).

**13.** 15 U.S.C. § 78g(c)(1) states:
(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or main-

(c) Special Cash Account

(1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may:

\*   \*   \*   \*   \*   \*

(ii) Sell any security for, or purchase any security from, any customer, provided the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be promptly deposited in the account.

12 C.F.R. § 22.4(c)(1)(ii). This portion of Regulation T imposes an obligation upon a broker to have a "good faith" belief at the time it executes a sell order for a cash account that the customer (here, Richardson) will promptly deliver the stock to the broker. *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1175 (8th Cir. 1972). This obligation has been construed to be a continuing one; the initial good faith acceptance of a sell order is not complete compliance with the rule and the broker has the duty to liquidate a transaction if it becomes apparent that the stock will not be delivered promptly. *Id.* at 1176. The term "promptly" does not indicate any fixed time limit for delivery; if, upon inquiry, the broker ascertains that slow delivery is unavoidable and out of his customer's control, "he may indulge a reasonable delay commensurate with the circumstances without any impairment of good faith." *Id.* at 1177.

In *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1140–41 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) ("*Pearlstein I*"), the Court of Appeals for this Circuit recognized an implied right of action under § 7 and Regulation T on behalf of a customer whose brokerage firm failed to comply therewith.

The portion of Regulation T involved in *Pearlstein I*, not at issue here, required a broker to liquidate a transaction if a customer purchased a security in a special cash account and failed to make full cash payment within seven days, 12 C.F.R. § 220.-4(c)(2). The court reasoned that the securities laws charged brokers with knowledge of margin requirements and the duty to obey them. Although it noted that Congress's purpose in enacting § 7 was to protect the economy as a whole from market speculation rather than to protect individual investors from their own inability to pay, the court determined that private actions by investors were an effective means of protecting the overall economy. 429 F.2d at 1140–41. The continuing vitality of this implied cause of action has recently been questioned by both the Court of Appeals, *Pearlstein v. Scudder & German*, 527 F.2d 1141, 1145 (2d Cir. 1975) ("*Pearlstein II*") and several judges of this district. *See, e. g., Newman v. Pershing & Co.*, 412 F.Supp. 463, 468 n.7 (S.D.N.Y.1975); *Bell v. Winer & Co.*, 392 F.Supp. 646, 652–54 (S.D.N.Y. 1975). Subsequent to *Pearlstein I*, Congress enacted § 7(f) of the Exchange Act and the Federal Reserve Board promulgated Regulation X, 12 C.F.R. § 224, making it unlawful to obtain credit in violation of margin requirements. "The apparent effect of these new enactments was to make an investor equally responsible with a broker for observance of margin requirements." *Newman v. Pershing & Co., supra*, 412 F.Supp. at 468 n.7.

WFSCC has brought only one case to this court's attention in which a defendant sought, as here, to raise a broker's violation of Regulation T as a *defense* to a 10b–5 claim by the broker rather than as a basis for affirmative relief against the broker as in *Pearlstein I*. *See Grimes, Hooper, & Messer, Inc. v. Pierce*, Fed.Sec.L.Rep. ¶ 95,-341 (C.D.Cal.1973), *aff'd per curiam*, 519 F.2d 1089 (9th Cir. 1975). Although the *Grimes* court indicated that a Regulation T

tain credit or arrange for the extension or maintenance of credit to or for any customer.—
(1) on any security (other than an exempted security), in contravention of the rules and

regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section.

violation would bar a broker from recovering against a bank as an aider and abettor in a fraudulent short-selling scheme, this legal conclusion was not necessary for the disposition of the case because the court implicitly found that the broker failed to show that the bank had knowledge of the fraud. *See* Fed.Sec.L.Rep. ¶ 95,341, at 98,-691. In any event *Grimes* was decided before Congress's enactment of § 7(f) and the promulgation of Regulation X. The doubtful status of the implied right of action under Regulation T certainly weakens WFSCC's contention that Regulation T violations may be interposed as a defense to fraud.[14]

■ Even if Regulation T may be employed in this manner, the court finds that Edwards & Hanly did not violate its terms. The existence of "good faith" is to be judged on the totality of circumstances. The usual practice in the industry was to allow brokers more time to effect deliveries than was accorded retail customers. Delays of over three weeks were tolerated because all concerned realized that brokers act as middlemen and must often await delivery from their customers as well as complete required paper work. Only a small percentage of the failed trades were more than three weeks late in delivery. Moreover, this is not a case in which the broker made no inquiry concerning the reasons for delay. In late March and early April 1975, Edwards & Hanly made repeated inquiries of both Richardson and WFSCC about late deliveries. Considering the industry's usual toleration of late deliveries, the court is not convinced that Richardson's excuses for delay were anything less than credible to plaintiff. Nor were the number of sales made in March substantially greater than the number made in November and December upon which delivery, though late, was made. In short, the court finds no violation of Regulation T at the time any of the sale orders were executed or at any time thereafter.[15]

### Damages

■ Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), limits recovery in securities law actions to "actual damages." The appropriate measure of damages for the violation proven in this case is the difference between the price at which Richardson sold the securities through plaintiff and the price plaintiff was required to pay to buy in the securities, including dividend charges, $1,441,122.45. (Plaintiff's Exhibit 15). Defendant does not dispute this amount, nor does it claim that Edwards & Hanly failed to mitigate its damages once the Richardson insolvency occurred. Let the clerk enter judgment for plaintiff for $1,441,122.45 plus interest from April 15, 1975.

So Ordered.

14. Nor is WFSCC aided by § 29(b) of the Exchange Act, 15 U.S.C. § 78cc, which provides in pertinent part:

Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . the performance of which involves the violation of, or the continuance of any . . . practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the right of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

This section merely "establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation. . . . [The section] render[s] the contract merely voidable at the option of the innocent party . . . ." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387–88, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970). WFSCC is hardly an unwilling innocent party capable of invoking § 29(b). *See Naftalin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 469 F.2d at 1182. In any event, Edwards & Hanly is suing for fraud, not on its contract with Richardson.

15. WFSCC has raised various other affirmative defenses including alleged violations of § 10(a) of the Exchange Act, 15 U.S.C. § 78j(a); Rules 10a–1 and 10a–2, 17 C.F.R. §§ 240.10a–1 and 240.10a–2; New York Stock Exchange Rules 387, 431 and 433; and Article III, § 1 of the National Association of Securities Dealers Rules of Fair Practice. Assuming *arguendo* that violation of any of these provisions can preclude or limit recovery for fraud, the court finds that none of these defenses has merit.